UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| LOUISE MILAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No. 3:13-cv-1-WTL-WGH |
| | ) | |
| CITY OF EVANSVILLE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the Defendants' motion for summary judgment (dkt. no. 75). The motion is fully briefed, and the Court, being duly advised, **GRANTS IN PART AND DENIES IN PART** the motion for the reasons and to the extent set forth below.

## I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court accepts as true the admissible evidence presented by the non-moving party and draws all reasonable inferences in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND

On June 20, 2012, the Evansville Police Department ("EPD") became aware of threatening posts on the discussion based website Topix.com.[1] The following posts were discovered under the heading "EPD leak!!! All officers addresses are being passed around Evansville":[2]

> "Me n my boys need them copys asap.need to pay a few a visit."

> "[Chief] Bolin lives behind parkside"

> "Lol at all da cops commenting,f#+k the police.you mfs need to b taught a lesson,always harassing n violating mfs rights. 4th of July a cops house gonna got hit.dont care about your kids or btchs lives.I dnt even care about my own life.I got my reasons…times ticking.?"

> "Cops be aware.Note:I am proudof my county,but I hate police of any kind..I have explosives.:) made in America.Evansville will feel my pain.guess who's in the river."[3]

Another heading read, "New Indiana law. You have the right to shoot cops." The following post was found under that heading:

> "You think cops always win,until now.I got some new artillery I want to test on there thin a$$ vest"

The EPD immediately began an investigation into the threats. After subpoenaing Topix.com and Insight (the local internet service provider which was subsequently purchased by Time Warner Cable), Detective Bryan Brown determined that the threatening posts were all

---

[1] It is not entirely clear how the EPD first became aware of the threats. EPD Chief Billy Bolin recalls receiving phone calls from an FBI agent and an unknown citizen. The EPD also received notice from Kayla Moody, a local television reporter. There is also evidence that other EPD officers were contacted by members of the public regarding the posts.

[2] All grammatical, spelling, and other errors in the headings and posts are retained.

[3] At the time the posts were made, the EPD was investigating a homicide case where the victim's body was found in the Ohio River.

made from an IP address connected with 616 East Powell Avenue, Evansville, Indiana, where sixty-eight-year-old Plaintiff Louise Milan ("Milan") lived with her eighteen-year-old daughter Stephanie Milan ("Stephanie"). Thereafter, Detective Brown drove past Milan's residence and determined that there was one open wireless access point ("WAP") in the area of Milan's home; all others were secured. He could not tell at that time, however, whether it was Milan's WAP that was unsecured.

Shortly thereafter, officers performing surveillance on Milan's home noticed Derrick Murray, a known LA Zombies gang member and a "thorn to the police department for a while," two houses down from Milan's home on his mother's front porch. Murray had a prior conviction for intimidating a police officer and had sprayed "187" on an officer's garage.[4] Murray was well-known to the EPD, and the officers involved with this investigation were familiar with his criminal record.

On June 21, 2012, just one day after the threats were discovered, Detective Brown obtained a search warrant for Milan's residence. His warrant request summarized their investigation, but left out any mention of Murray or the unsecured wireless network. The request also stated that "in order for a particular electronic device to utilize a particular IP address, . . . [it] requires the electronic device to be *in* the residence of 616 E. Powell Avenue to access the internet provided . . . to the residence." Dkt. No. 80-19 at 3 (emphasis added).

About this time, Detective Todd Seibert discovered that Milan's step-son, Anthony Milan, Sr., was a registered sex offender and had previously been arrested on drug and assault charges. His son, Anthony Milan, Jr., also had several recorded run-ins with police, some

---

[4] The Court is generally aware that the number "187" is a police code for homicide and is sometimes used as a synonym for murder. The parties do not otherwise identify the significance of this number.

involving allegations of violence. Once Milan, Jr., became a potential suspect, Officers searched his Facebook page and found a photograph of him pointing a gun and using gang signs. Although the officers were aware that Milan, Sr., and Milan, Jr., did not live with Milan, her address was identified in the EPD's records management system as a previous known location (approximately four years earlier) for Milan, Sr.[5] Detective Seibert also considered a possible familial relationship between Milan and LA Zombies gang member Marc Milan, due to their shared last name. Marc's record included arrests on drug and weapons charges, and he was also known to associate with Murray.[6] During the short period of surveillance, however, officers never saw any of these individuals enter or leave Milan's residence.

Before executing the warrant, Lt. David Molinet completed a routine threat assessment worksheet to gauge the potential danger associated with serving the warrant at Milan's home.[7] According to Lt. Molient, "[t]he threat assessment considered the . . . issues relating to the threats of assault on officers, the references to explosives and armor piercing bullets, and pictures of Anthony Milan, Jr., with a handgun." Defs.' Br. 8. Based on the outcome of the threat assessment worksheet, Lt. Molinet concluded that the SWAT team was necessary to execute the warrant at Milan's home.

Thereafter, due to the nature of the threats and taking into account Milan, Jr.'s, photograph with a gun, Officer Mike Gray, the SWAT team leader, decided that, for officer

---

[5] Milan, Jr., was connected with Milan's home through his father.

[6] After the search warrant was executed, it was determined that Milan was not familiar with Marc.

[7] EPD's threat assessment worksheet assigns points to certain potential threats that may be encountered when executing a search warrant or an arrest warrant. For example, if a suspect is "known or believed to possess" explosives, a certain number of points are assigned. When all line items are added, the total number of points correlates to whether the SWAT team should be consulted or used to effectuate the warrant.

safety, distraction devices (also known as "flash bangs" or "stun grenades") would be used to make entry into Milan's home.[8] This decision was made, and ultimately carried out, despite the fact that Murray—and not Milan or her relatives—was identified during the "pre-raid briefing" as likely being "ultimately responsible" for the threats. Officer Gray's SWAT plan was subsequently approved by Lt. Molinet. According to Chief Bolin, although he generally has authority over the SWAT team, he did not specifically approve or disapprove of the SWAT plan or the use of distraction devices in this case. The SWAT team After-Action Report, however, identified Chief Bolin as being responsible for the "call-out" of the SWAT team. Chief Bolin was also present at Milan's home when the SWAT team executed the search warrant.[9]

Additionally, before officers executed the warrant, Chief Bolin instructed Sergeant Jason Collum to contact the local news media about the raid. He felt that the EPD should "repay the favor" to the news reporter who had notified the EPD about the threats. As a result, a news crew followed the SWAT team to Milan's home and videotaped the raid.

Once at Milan's home, the SWAT team officers rushed to the front of her house.[10] Immediately after they announced their presence, officers broke through Milan's front door and a nearby window and deployed two distraction devices into her home. Thereafter, SWAT team members rushed into the house and cleared the residence. Milan and Stephanie, although physically unhurt, were ordered to the ground at gunpoint and escorted from the home in

---

[8] According to Officer Gray, "distraction devices cause persons to be temporarily paralyzed by the sound and light and give EPD Officers a tactical advantage and a higher degree of safety" when entering a location. Defs.' Br. at 12.

[9] Chief Bolin testified that, looking back, he approves of the amount of force used to execute the warrant and Officer Gray's decision to use distraction devices.

[10] In addition to the news footage, one of the SWAT team members wore a helmet camera. The Court has reviewed this video, as well as the news footage.

5

handcuffs. The entire ordeal was filmed by the news crew (from outside Milan's home) and was the lead story on the news that night. After questioning the women for approximately twenty minutes, however, the officers determined that they were not responsible for the threats and released them. Officers also quickly determined that Milan's WAP was the unsecured WAP that Detective Brown had discovered the prior day.

While the EPD was still on the scene, officers once again observed Murray on his mother's front porch. Thereafter, Murray became the EPD's prime suspect. On June 22, 2012, just one day after the search at Milan's home, Detective Brown subpoenaed records from Facebook and determined that Murray had logged onto Facebook using Milan's unsecured WAP. A search warrant for Murray's house was issued on June 23, 2012. Two days later, officers executed the search warrant and removed electronic devices from his residence.[11] It was later determined that the threating posts on Topix.com originated from Murray's cell phone, and Murray pled guilty to a federal charge stemming from the threats.

After the incident at Milan's home, the City of Evansville replaced her door and window and assisted her with securing her WAP. Chief Bolin also formally apologized to Milan by letter. He wrote, in part:

> I truly am sorry for the damage we caused to your home and that you had to go through this. . . . [H]ad we known you personally before this, we could have used a different plan of action. Your family has been very nice in a very trying time. I'm also sorry for any embarrassment this may have caused.

Dkt. No. 80-8 at 3.

---

[11] This time, the SWAT team was not used. Rather, after a period of surveillance on the home, officers chose to knock and announce their presence. Days later, an officer contacted Murray and spoke to him about the investigation. Subsequently, Murray was asked to come to the EPD headquarters, where he was arrested without incident.

Nevertheless, Milan filed the instant litigation against the City of Evansville, the EPD, Chief Bolin, Lt. Molinet, Officer Gray, and the individual SWAT team members that entered her home on June 21, 2012. Milan alleges that the "Defendants violated [her] rights as protected by the Fourth and Fourteenth Amendments of the United States Constitution by subjecting [her] to an unreasonable search and seizure, . . . by using unreasonable and/or excessive force[,] . . . and falsely arresting and/or wrongfully detaining [her]." Third Am. Compl. at ¶27. She further alleges that the "Defendants acted pursuant to an established policy, procedure or custom, and/or the acts or omissions of the City of Evansville or Bolin." *Id.* at ¶28.

## III. DISCUSSION

The Defendants argue that they are not liable to Milan because they acted reasonably under the circumstances and, assuming they acted unreasonably, they are entitled to qualified immunity. For these same reasons, the Defendants also argue that Milan's *Monell* claim against the City cannot survive.[12] Milan, on the other hand, argues that

> the Defendants violated the protections of the [Fourth] Amendment with the defective search warrant, investigative malfeasance, using the SWAT team to raid and smash their way into Milan's home (without adequate warning), the use of flashbang grenades during the raid[,] and how the flashbang grenades were deployed[,] all violated Louise Milan's rights . . .

Milan's Br. at 27. The parties' arguments are discussed in detail below.

### A. Unreasonable Search and Seizure

Milan's complaint alleges that the search warrant was defective. It appears she bases this claim on the fact that the search warrant request stated that electronic devices associated with

---

[12] *Monell* refers to the Supreme Court case *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (holding that local governments may be found liable under § 1983 for constitutional deprivations caused by an official policy or custom).

7

Milan's IP address had to be inside her residence.[13] When Detective Brown made this statement, however, he knew that an unsecured Wi-Fi network in a residence may be accessed from outside the home. The Court is troubled by Detective Brown's statement. Even so, the Court finds that his statement did not render the search warrant invalid. Even if Detective Brown had stated that Milan's router could be accessed from outside the home, the warrant would still be supported by probable cause. The threats were made using Milan's IP address; "though it was possible that the transmissions originated outside of the residence to which the IP address was assigned, it remained likely that the source of the transmissions was inside that residence." *United States v. Perez*, 484 F.3d 735, 740 (5th Cir. 2007); *see also United States v. Mejia*, 2012 WL 4434367 at *4 (N.D. Ill. 2012) (discussing similar holdings); *United States v. Massey*, 2009 WL 3762322 at *5 (E.D. Mo. 2009) (discussing similar holdings). Thus, there was probable cause and the search warrant was not constitutionally defective. Summary judgment is therefore **GRANTED** as to this claim.

### B. False Arrest/Unreasonable Detainment

Milan's complaint also alleges that she was falsely arrested.[14] Milan's claim is presumably based on the fact that she was handcuffed and briefly detained following the SWAT raid on her home. Milan, however, was detained for purposes of the search warrant. A proper search warrant "carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705 (1981). After Milan and

---

[13] Milan does not focus on and provides no legal support for this claim in her response to the Defendants' motion for summary judgment. Rather, Milan focuses the majority of her brief on her excessive force claim.

[14] Again, Milan does not focus on and provides no legal support for this claim in her response to the Defendants' motion for summary judgment.

Stephanie were removed from the residence in handcuffs, they were questioned by Detective Brown for approximately twenty minutes. During that time, he determined that they were not suspects and they were released. Having found that the search warrant was supported by probable cause, the Court also finds Milan's brief detainment to be reasonable under the circumstances. Accordingly, summary judgment is **GRANTED** as to this claim.

### C. Unreasonable Use of Force

Now, to the heart of Milan's case. Milan strongly insists that the EPD's use of force in executing the search warrant was unconstitutionally excessive. Although the search warrant and Milan's subsequent detainment were reasonable, the Court finds that questions of fact remain as to whether the EPD used an unreasonable amount of force under the circumstances, such that the issue must be resolved by a jury.

"In executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." *Los Angeles Cnty., California v. Rettele*, 550 U.S. 609, 614 (2007).

> To determine whether the force used to effect a particular seizure is reasonable, we balance the nature and quality of the intrusion on the individual's rights against the "countervailing governmental interests at stake." . . . Factors to consider in making a determination of whether the amount of force used to effectuate a seizure is reasonable include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight. . . . Other factors include whether the individual was under arrest or suspected of committing a crime, was armed, or was interfering or attempting to interfere with the officer's execution of his or her duties. *See McDonald v. Haskins*, 966 F.2d 292, 292–93 (7th Cir. 1992). In the end, the excessive force inquiry "looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers . . . ." *Id.* at 294; *see also Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) (finding that the amount of force that is constitutionally permitted to execute a seizure decreases with the threat of danger posed by the individual being seized).

*Estate of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010) (citation omitted). With regard to the use of flash bangs in particular, the Seventh Circuit has summarized as follows:

> We have previously indicated that the use of flash bang devices should be limited and is not appropriate in most cases. In *Molina v. Cooper*, 325 F.3d 963 (7th Cir. 2003), while we found that the officers' use of flash bang devices during the execution of a "high risk" search warrant—which was obtained for Molina's home on suspicion of drug activity—was reasonable because Molina had a criminal history that included aggravated assault, was alleged to be the head of a drug distribution organization, was associated with gangs, was home and had access to a stash of weapons, we expressly stated that "we in no way suggest that the use of flash bang devices is appropriate in every case (or even most cases)." *Id.* at 966 n. 1, 973. In finding that the officers' deployment of flash bang devices was reasonable, we emphasized that the officers had a significant reason to be concerned about their personal safety and we expressly limited our holding to the circumstances presented in that case. *See id.* at 973. In *United States v. Folks*, 236 F.3d 384 (7th Cir. 2001), we discussed, in dicta, the potentially serious injuries that may arise from the use of a flash bang device during a search. We suggested that a sufficiently careful (or perhaps reasonable) use of a flash bang device occurs when officers take a moment to look inside a residence or a room to ensure that no one would be injured by the device before tossing it and where officers carry a fire extinguisher to quickly extinguish any fires resulting from deployment of the device. *Id.* at 388 n. 2. We also, in no uncertain terms, pointed out that the use of a flash bang device is justified when "potentially *violent* people [can] be found in [a] house," as opposed to individuals who pose no threat to the police or others. *Id.* at 388 n. 2 (emphasis added). We noted that if the government does not use discretion in when and how they use flash bang devices, they "may [ ] risk significant damage claims from the careless deployment of flash-bang devices." *Id.* In *United States v. Morris*, 349 F.3d 1009 (7th Cir. 2003), we explicitly stated that this Court has "often emphasized the dangerous nature of flash-bang devices and has cautioned that the use of such devices *in close proximity to suspects may not be reasonable*." *Id.* at 1012. (Emphasis added). We suggested, also in dicta, that the use of a flash bang grenade is reasonable only when there is a dangerous suspect and a dangerous entry point for the police, when the police have checked to see if innocent individuals are around before deploying the device, when the police have visually inspected the area where the device will be used and when the police carry a fire extinguisher. *See id.* at 1012 n. 1.
>
> We also discussed the appropriateness of using flash bang devices in *United States v. Jones*, 214 F.3d 836, 837–38 (7th Cir. 2000). In *Jones*, we were disturbed by the officers['] use of flash bang devices and stated that while the district court found their conduct to be reasonable, we were less certain. *Id.* Specifically, we unambiguously stated that "police cannot automatically throw bombs into drug dealers' houses, even if the bomb goes by the euphemism 'flash-bang device,'" particularly where they do not believe the drug dealer is an unusually dangerous

individual. *Id.* We found this to be true even though guns are normally used in the drug trade and even where a drug dealer has a prior weapons offense. *Id.* Lastly, while *Jones* was a criminal case that discussed the use of flash bangs in the context of suppressing evidence, we specifically stated that "[i]f this were a damages action seeking compensation for injury to the occupants or to the door, the claim would be a serious one." *Id.*

Other circuits have similarly considered the constitutional limits of using a flash bang device. *See, e.g.*, *Boyd v. Benton County*, 374 F.3d 773, 777–79 (9th Cir. 2004) (use of flash bang device unconstitutional use of excessive force where police deployed it without either looking or sounding a warning when there were innocent individuals in a room as well as suspected robbers).

*Escobedo*, 600 F.3d at 784-85.

In this case, although the Topix.com posts threatened violence, the unidentified suspect was guilty only of intimidating a police officer (a Class D Felony) and/or making threatening communications on the internet (corresponding to a base offense level of 12).[15] These crimes are fairly low on the severity scale. Additionally, whether the suspect posed an *immediate* threat to the police officers is questionable. The suspect threatened that he had explosives, and the officers considered Milan, Sr., Milan, Jr., and Marc—individuals with varied criminal records—to be potential suspects. However, there is little evidence showing that those individuals would be found in the home, and officers believed prior to the raid on Milan's home that Murray was "ultimately responsible" for the threats. Moreover, there was no real "emergency situation" on June 21, 2012; the suspect alleged that he would take action two weeks later on July 4. Indeed, by subpoenaing Facebook just one day after the raid on Milan's home, the officers were able to identify Murray as the likely culprit. Furthermore, the videos show that the SWAT team officers broke through Milan's window and door and tossed (rather than strategically placed) the distraction devices into her home within seconds of arriving at her front door. It is questionable

---

[15] In fact, Murray was sentenced to only sixteen months in prison.

11

whether the officers had sufficient time to look inside to ensure that no one would be injured by the devices. It is also undisputed that the officers were not carrying a fire extinguisher during the search.[16] These facts lead the Court to conclude that there are questions of fact regarding whether the Defendants' actions were unreasonable and excessive. Thus, summary judgment on this issue is not appropriate. The Court therefore **DENIES** summary judgment as to this claim.

### D. Qualified Immunity

Notwithstanding the foregoing, the Defendants argue that, regardless of whether they acted reasonably, they are entitled to qualified immunity. "Qualified immunity shields a government official from liability for civil damages unless his or her conduct violates a clearly established principle or constitutional right of which a reasonable person would have known at the time." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (citations omitted). In determining whether a defendant is entitled to qualified immunity, courts must determine: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant[] violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012).

As discussed above, Milan has alleged sufficient facts to withstand summary judgment on her excessive force claim. As to the second prong of the inquiry, that is: whether the law was clearly established as of June 21, 2012, that the force used by the SWAT team to execute the search warrant at Milan's home violates the Fourth Amendment right to be free from excessive force, the Court finds that Milan has satisfied her burden.

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"

---

[16] There was a fire extinguisher in the SWAT truck.

*Escobedo*, 600 F.3d at 779 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). A plaintiff "can demonstrate that the right was clearly established by presenting a closely analogous case that establishes that the Defendants' conduct was unconstitutional or by presenting evidence that the Defendant[s'] conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Id.* (citations omitted). The Court is sympathetic to the fact that a police officer's job is dangerous and unpredictable. Police officers face unknown dangers every day, and they are often forced to make life or death decisions in an instant. Taking the facts in the light most favorable to Milan, however, the Court finds that the constitutional right at issue in this case was clearly established on June 21, 2012.

As noted above, in 2010, the Seventh Circuit stated that "the use of flash bang devices should be limited and is not appropriate in *most* cases." *Id.* at 784 (emphasis added). Moreover, the Seventh Circuit summarized in *Escobedo* when the use of a distraction device might be considered reasonable. *See* supra, Section III.C. In short, the facts or factors noted in that case are not present here.

As detailed above, the decision to use the SWAT team and the distraction devices was made based solely on the nature of the threats and the *small* possibility that Milan, Sr., Milan, Jr., or Marc were responsible for the threats and would be found inside Milan's home—that is it. The officers, however, did not see any of those men enter or leave Milan's residence during their period of surveillance. Additionally, the officers suspected that Milan's WAP was unsecured and that Murray was "ultimately responsible" for the threats long before they executed the search warrant at Milan's home. Thus, there was little—if any—evidence that they would encounter a *violent* person. As discussed above, there was also no emergency situation (as the threat was for July 4), the officers did not carry a fire extinguisher, and the videos arguably indicate that the

13

officers did not have sufficient time to look inside the residence for individuals who might be harmed before tossing (rather than placing) the distraction devices into Milan's home. Lastly, there did not appear to be a dangerous point of entry. It was a clear day, and the front door (but not the storm door) was open when the SWAT team arrived.

For these same reasons, the Court also concludes that the EPD's use of force "so clearly exceeded the bounds of reasonableness in the circumstances that it cannot be said to lie near the 'hazy border between excessive and acceptable force' along which qualified immunity shields officers from liability for their snap judgments, if those judgments prove to be wrong upon further reflection." *Id.* at 786. These were not snap judgments; they were methodical and deliberate decisions, which were based on limited facts and an incomplete investigation. A reasonable officer would know that the EPD's actions were constitutionally excessive.

On these facts, viewed in the light most favorable to Milan, of course, the Court finds that qualified immunity does not shield the EPD from liability.

### E. *Monell* Claim

Lastly, Milan seeks to hold the City of Evansville responsible for the EPD's actions. A municipality may be found liable under § 1983 when it violates constitutional rights through an official policy or custom. *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010) (citing *Monell*, 436 U.S. at 98). "To establish an official policy or custom, a plaintiff must show that his constitutional injury was caused by (1) the enforcement of an express policy of the [city], (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Id.* (citation and quotation marks omitted). Milan argues that Chief Bolin had final policymaking authority and was responsible for the SWAT team's actions on June 21, 2012. Indeed, "a police chief in Indiana is

14

the final policymaker for his municipal police department." *Eversole v. Steele*, 59 F.3d 710, 716 (7th Cir. 1995). Although Chief Bolin is adamant that he did not approve of the SWAT team plan utilized in this case, the evidence viewed in the light most favorable to Milan (namely Chief Bolin's presence at Milan's home during the raid couple with his name appearing on the "After-Action Report") would support a finding that Chief Bolin was responsible for the "call-out" of the SWAT team, and thus had final policymaking authority over the SWAT team on June 21, 2012. Because Chief Bolin's role in relation to the SWAT raid is disputed, the Court finds that there are questions of material fact on this issue. Thus, summary judgment is **DENIED** as to Milan's *Monell* claim related to the EPD's use of force.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' motion for summary judgment (dkt. no. 75) is **GRANTED** as to Milan's claims for unreasonable search and seizure and false arrest/unreasonable detainment, and **DENIED** as to Milan's claim for excessive force. The motion is also **DENIED** as to Milan's corresponding claim against the City under *Monell*.

Due to a scheduling conflict, the Court also vacates the final pretrial conference currently scheduled for Friday, February, 6, 2015 at 1:00 p.m., and the three-day jury trial scheduled to begin on Monday, March 2, 2015 at 9:00 a.m. The final pretrial conference is hereby reset for **Friday, March 6 at 11:00 a.m. CST/12:00 p.m. EST**, and the three-day jury trial shall now begin on **Monday, April 6 at 9:00 a.m. CST**.[17] Absent further notice from the Court, both will be held in Courtroom 301 of the Winfield K. Denton Federal Building and U.S. Courthouse, 101

---

[17] On March 4, 2014, the Court's order erroneously scheduled this matter for a bench trial. Dkt. No. 61. To be clear, this matter remains scheduled for a jury trial.

Northwest MLK Blvd, Evansville, Indiana. The parties are reminded of their related pretrial deadlines.

SO ORDERED: 1/06/15

_William T Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.